ARKANSAS STATE FAIR ASSOCIATION *v*. HODGES.

Opinion delivered July 12, 1915.

1. MANDAMUS—STATUTES—PUBLICATION.—Mandamus may be instituted against the Secretary of State, by a person having a special interest in the publication of a legislative act, to compel its publication among the acts of the Legislature.

2. EVIDENCE—APPROVAL OF BILL BY GOVERNOR—ADMISSIBILITY OF PAROL EVIDENCE.—In mandamus proceedings by an association, which alleged its special interest, to compel the Secretary of State, under article 6, section 15, Constitution of 1874, to publish a certain act, among the acts of the Legislature, parol evidence, extrinsic to the legislative records, which showed that the bill was vetoed, is admissible to determine whether the Governor had first approved the bill before vetoing it.

Appeal from Pulaski Circuit Court, Second Division; *Guy Fulk*, Judge; affirmed.

*W. H. Martin* and *James P. Clarke*, for appellant.

1.   83 Ark. 448, settles the law of this case in Arkansas.   50 Ark. 333.   The practice is settled by 108 Ark. 184.   Parol proof was admissible.   86 Ark. 74; 2 Cal. 105; 65 Ark. 53; 6 Wall. 499; 54 Ark. 270.   See also 18 Ind. 24; 84 Kan. 856; 109 Ark. 563; 10 Pac. 858.

*W. L. Moose,* Attorney General, and *Mehaffy, Reid & Mehaffy,* for appellee.

1. Parol proof was not admissible to show that the Governor first approved the bill and then vetoed it. The record is conclusive. 60 Atl. 599; 210 Ill. 48; 71 N. E. 602. See also 6 Wall. 499.

2. Mandamus will not lie. 71 N. E. 604.

SMITH, J. The appellant filed its petition for mandamus in the Pulaski Circuit Court whereby it sought to compel appellee, the Secretary of State, to publish among the acts of the Legislature of the State of Arkansas, House Bill No. 258, commonly known as the State Fair Bill, alleging that said act had been duly passed by the General Assembly at its biennial session in 1915 and had been approved by the Governor of Arkansas. Appellant alleged a special interest in the bill. The petition alleged that appellee had refused to publish said act after demand upon him, giving as his reason that the Governor of Arkansas had withheld his approval from said act and had vetoed it within the constitutional limit of time.

The petition further alleged that an enrolled copy of said act, endorsed by the presiding officers of the House and Senate, was presented to the Governor on Tuesday, March 2, 1915, at 4:30 o'clock P. M. That on Monday, March 8, in the forenoon, the Governor prepared a veto message, setting out his reasons for withholding his approval of said act, but afterward, and before communicating said message to the House in which said bill originated, and at 4 o'clock of said day, the Governor reconsidered his determination to veto said bill and affixed his signature thereto with the intent and for the purpose of approving the same in the manner provided by the Constitution, in order to make said bill effective as a law. That after so signing and approving the bill, a discussion ensued in the Governor's office with reference to the propriety of the action he had just taken, as a result of which he attempted to reconsider his action in approving the bill, which he manifested by writing in front of the word "approved" the prefix "dis," thus indicating

his purpose to cancel and annul his previous action in approving and signing said bill. That thereupon a number of persons interested in the enactment of the law intervened with the Governor and importuned him to revoke his action in thus cancelling his approval and signing of the bill aforesaid. That thereupon the Governor still being in possession of the enrolled act, struck out the syllable "dis," which he had previously added thereto, thus leaving the signature previously attached to the bill in the form of an unconditional approval of the act. That the Governor thereupon delivered the bill to his private secretary with directions to lodge same in the office of the Secretary of State and to notify by usual message the House of Representatives of his action in thus approving the bill. That for some minutes after the Governor had thus finally approved the act and given directions for its transmission to the office of the Secretary of State and notification to the House, the persons then assembled in the Governor's office exchanged mutual congratulations between themselves and the Governor and entered upon a discussion of the *personnel* of the commission provided for in said act, after which they dispersed. That immediately thereafter the Governor dispatched a messenger to his secretary, requesting that the bill be returned to him without being delivered to the Secretary of State, and also directed his secretary to withhold notice of his approval thereof from the House of Representatives. That the enrolled and approved bill was accordingly redelivered to the Governor, who took the same in his personal possession; that on the night of said Monday, March 8, 1915, at 9 o'clock the Governor returned said bill to the House of Representatives then in session, together with a statement of his objections thereto; that he had in the meantime reinserted the syllable "dis" before the word "approved" on the enrolled bill and had likewise inserted by way of a caret the words "and vetoed" after the word "approved;" that upon receipt of this message by the House and the return of the enrolled bill with the several endorsements indicated, a

point of order was raised and sustained to the effect that the bill had become a law by reason of the failure of the Governor to return same at an earlier date, and thereafter no further action was taken by the House in connection with said bill, but the same was accordingly delivered by the clerk of said House to the Secretary of State, who now has the same in his personal custody and possession.

That upon the affixing of his signature to the enrolled bill for the purpose and with the intent of approving the same, he (the Governor) exhausted his power to deal further with the same, as the act had then become a valid and enforcible statute of the State of Arkansas, and the return of said bill to the House of Representatives, together with his pretended veto message at the hour, aforesaid, were wholly ineffective and void and the refusal of the defendant to include said statute in the acts of the General Assembly is not justified by said pretended veto.

There was a prayer for a writ of mandamus requiring the Secretary of State to publish the said act among the published acts of the session of the General Assembly of 1915.

Appellee answered the complaint on the 8th day of April, 1915, admitting his duty to publish and certify the laws passed by the General Assembly; admitting that the General Assembly at its biennial meeting passed House Bill No. 258, as set out in the complaint; that he refused and now refuses to certify to the correctness thereof for the purpose of having same published, and that said refusal was made for the reason that the bill had never been approved by the Governor but had been vetoed by him.

Appellee in his answer denied the statement of fact with reference to the circumstances attending the disapproval and veto of said bill, but admitted the receipt by the Governor on March 2 at 4:20 P. M. of the enrolled copy of said bill, and alleged that on Saturday, March 6, 1915, the Governor, having decided to disapprove and

veto said bill, prepared and executed a message addressed to the House of Representatives, giving his reasons for withholding his approval, and that later, on March 8, this message was duly transmitted to the House of Representatives, then in session, together with said bill. The answer denies that at 4 o'clock on Monday, March 9, he reconsidered his determination to veto said bill and alleged that at no time did he signify his intention to reconsider or retract his veto. That about 4 o'clock in the afternoon of March 8, the enrolled bill, then being in the possession of the Governor, he, with his own hand, wrote immediately above the line as entered on said bill, left by the enrolling clerk for the signature of the Governor the syllable "dis" which immediately preceded the word "approved;" said word "approved" having been placed on said bill by the enrolling clerk of said House, and immediately following said word "approved" the Governor wrote the following: "And vetoed March 8, 1915, at 4 o'clock P. M.," leaving the endorsement, "disapproved and vetoed March 8, 1915, at 4 o'clock P. M." That after this endorsement was made by the Governor he signed his name on the line left by the clerk for that purpose, under which were the words, "Governor of the State of Arkansas," written by the enrolling clerk. That in so signing said bill he intended thereby to disapprove and veto the same, and at no time afterward did he reconsider or retract his act in vetoing said measure.

That after 4 o'clock P. M. on said day the Governor ran his pen through the syllable "dis" and the word "and" in the endorsement so that said endorsement then appeared "approved, vetoed, March 8, 1915, at 4 o'clock P. M." That at few minutes later the Governor restored the syllable "dis" and the word "and" to said endorsement, so that it finally appeared "disapproved and vetoed March 8, 1915, at 4 o'clock P. M.," in which form said endorsement now appears. That upon these facts said House bill was vetoed.

The answer then alleges that the bill was unconstitutional in any event, but that allegation has been abandoned and is not now discussed by either party to this litigation.

The court below made among others the following findings of fact:

"4.    That shortly after said hour of 4 o'clock P. M. on said 8th day of March, 1915, certain friends of the Governor, having importuned him to sign the same for the purpose of approval, he erased from said enrolled bill the prefix 'dis' before the word 'approved' and the word 'and' before the word 'vetoed,' leaving his signature endorsed on said bill as the same had been previously thereto attached by him; that after having stricken from the bill the endorsement previously made on said enrolled bill the words aforesaid, he handed the same to Mr. Stewart, his private secretary, with directions to him, the said secretary, to 'report' the same; that thereupon the secretary took into his possession the said bill and left the Governor's office for the purpose of reporting the same in compliance with directions given to him by the Governor; that at the time the Governor delivered said enrolled bill with his signature written below the words 'approved' 'vetoed,' to his said secretary and told him to report the same, he intended to subsequently recall the said bill, but no such intention on the part of the Governor was made known to the said secretary, nor any one else present at the time the said bill was so delivered with said directions to report the same.

"5.    That under the rules, regulations and practice in the Governor's office, a direction by the Governor to his secretary to 'report' a bill in manner and form as herein indicated, meant that the said secretary should notify the House in which the bill originated that the Governor had approved the same, and a further direction to the said private secretary to lodge the enrolled bill with the Secretary of State as one of the completely enacted laws of the State of Arkansas; that it was the purpose of said private secretary in pursuance of the direc-

tions so given to him by the Governor to so report said House Bill No. 258 to the House of Representatives as having been signed, and to subsequently lodge the bill with the Secretary of State as one of the statutes completely enacted by the General Assembly.

"6. . That within a few minutes after the Governor had so delivered said bill to his said secretary with the direction to 'report' the same, and while the said secretary was preparing the necessary document to be presented to the House of Representatives, the Governor caused a direction to be delivered to the said secretary to return the said bill to him, the said Governor, and thereby revoked the previous direction given to said secretary to 'report' the said bill as a completely enacted statute. In accordance with this latter direction from the Governor, the said secretary delivered said enrolled bill, with the endorsements thereon as the same existed at the time the bill was delivered to him to the Governor.

"That thereafter, namely, at 9:10 P. M. on said Tuesday, the 8th day of March, 1915, the Governor, having reinserted before the word 'approved' as the same appeared on said enrolled bill the prefix 'dis' and the word 'and' before the word 'vetoed,' permitting his signature to remain thereon as the same was shown at the time the said bill was delivered to the said private secretary, aforesaid, the Governor caused the said bill to be returned to the House of Representatives, together with a statement of his objections to the enactment thereof as a law of the State of Arkansas; that the said bill was not thereafter repassed by the said House of Representatives in the manner provided by the Constitution as in a case where a Governor shall return a bill without his approval."

Having made these findings of fact the court declared the law of the case to be as follows:

"That the said House Bill No. 258 was not signed by the Governor for the purpose and with the intent of giving his approval thereto as a valid statute of the State of Arkansas, and the defendant does not, therefore,

rest under any duty to include the same in the statutes to be copied for the public printer for publication."

The petition for mandamus was dismissed, and this appeal has been duly prosecuted from that order.

(1)    The case of *Hodges* v. *Keel,* 108 Ark. 184, is authority for the institution of a suit of this character.    A question had there arisen as to whether a certain bill which provided for the creation of a levee district had been approved by the Governor, and because of this controversy the Secretary of State refused to cause the act to be published as required by statute.    The plaintiffs in that suit were property owners within the proposed district, and instituted a proceeding to compel the Secretary of State to perform his duties in that respect.    The circuit court awarded a writ of peremptory mandamus as prayed, and the Secretary of State appealed to this court. It was there held that the plaintiffs had the right to maintain that suit, it being shown that they had a special interest in the publication of the act in question.    So here it is shown that appellants also have a special interest in this bill which entitles them to maintain this suit.

(2)    At the trial in the court below the Governor of the State, together with a number of other witnesses, testified in regard to the circumstances under which certain erasures found upon the bill were made.    There was evidence which tended to support the allegations of the complaint; but we do not set this evidence out for the reason that in the opinion of a majority of the court such evidence is not admissible.

It is said in the brief that the instant case owes its presence here to the decision of this court in the case of *Powell* v. *Hays,* 83 Ark. 448, and that under the opinion in that case parol proof is admissible in the determination of the question whether or not the chief executive had first approved a bill before the subsequently vetoed it. We do not agree with counsel in this contention.    It was said in this case of *Powell* v. *Hays* that the parties had joined issue as to the law governing a state of facts over which there was no dispute, and the court did not there

pass upon the competency of the evidence offered, and in the opinion on rehearing it was said that the decision was placed on the record evidence as well as on the admitted facts in the pleadings, and as we construe the opinion in that case it was not decided that parol evidence, which contradicts the record, could be considered for that purpose.

No such issue was presented in *Powell* v. *Hays.* The oral testimony there considered was introduced without objection, and the whole opinion shows that the court considered it merely because it was in the record without objection and because it did not conflict, but was in harmony, with the record evidence. As showing conclusively that the court in *Powell* v. *Hays* did not hold that oral testimony was competent to overturn the record, we quote the following: "Hence it is unnecessary to pass on the competency of the evidence offered—a question upon which the authorities are divided," etc. Therefore, it is a total misapprehension of *Powell* v. *Hays* to construe it as authority for the introduction of oral proof to contradict the record evidence of the enactment of a law. In the instant case objection was made from the beginning to the introduction of such testimony. The issue is squarely raised and we unhesitatingly declare the law to be that oral testimony is not competent to impeach the record evidence of the enactment or non-enactment of a law.

It is not contemplated under the Constitution of this State that the existence or non-existence of a law should depend upon either the recollection or the veracity of witnesses, and, in order that the existence of a law may not rest upon such uncertain foundation, the Constitution provides that a record shall be kept of each material step in the enactment of a bill into a law, and further provides for the custody of such law and for the preservation of the records which determine its existence.

Section 15 of article 6 of the Constitution provides that, "Every bill which shall have passed both Houses of the General Assembly shall be presented to the Governor;

if he approve it he shall sign it, but if he shall not approve it, he shall return it with his objections, to the house in which it originated, which house shall enter the objections at large upon their journal and proceed to reconsider it. * * *''

In the case of *Powell* v. *Hays, supra,* it was said that the veto message of the Governor was a part of the record to be considered by the court in passing upon the question there involved, and the court there said that the facts recited in the pleadings conformed to the records of the General Assembly and that there was no conflict whatever between the pleadings in the case, the records of the General Assembly and the testimony of the distinguished witnesses who testified in that case. But it was not there said that either the testimony of these distinguished witnesses, or the recitals in the pleadings, should control, or would have controlled, had they conflicted with the recitals contained in the record which had been made in conformity to the requirements of the Constitution and laws of this State evidencing the enactment of a bill into a law.

In treating the veto proclamation of the Governor as a part of the record in the case it was there said:

''Mr. Greenleaf says that public documents, such as executive proclamations, are admissible to prove pertinent facts when the statement is made therein by the person whose duty it is to make it and the subject-matter belong to his province or came within his official cognizance and observations. 1 Greenleaf on Evidence, § 491 (16 ed.).

''Therefore, the recitals of the Governor's proclamation which are pertinent to the issue, made within his province, and which state facts within his official cognizance, must be taken as record evidence *prima facie* at least proving the facts recited.''

The veto proclamation in the *Powell* v. *Hays* case, which was prepared by Acting Governor Pindall, very candidly recited the fact to be that upon his accession to office he found that the bill in question had been pre-

viously approved by his predecessor, and under this state of the record the court held that the power of the chief executive to pass upon the bill pending before him for his consideration had been exercised and that when the Governor had approved the bill and had signed it in attestation of his approval it became a law and could not subsequently be vetoed. It appeared from the bill itself in that case that it had been approved by Acting Governor Pindall's predecessor.

For the proclamation of Governor Pindall by which he attempted to veto the bill recites: "This bill I found in the possession of the Governor's office when I assumed the duties of Governor, and that it has already been signed by my predecessor in office."

The legislative record shows that the bill in question was not approved but was vetoed, and therefore we do not undertake to review and pass upon the questions of fact about which the Governor and other witnesses testified upon the occasion of his writing his name and the words which appear upon the bill. The endorsements now on the bill show that it was "disapproved and vetoed March 8, 1915, at 4 o'clock P. M." The entries upon the journal of the House of Representatives show that on March 8, 1915, the Governor returned the bill to the House of Representatives, which was "the house in which it originated," with a message showing his objections thereto, and this message was entered at large upon the journal of the House.

Looking only to those records which the Constitution provided should be made and kept for the purpose of determining questions like the one involved in the instant case, we conclude that the bill was not approved, but that it was vetoed and did not become a law. The judgment of the circuit court is, therefore, affirmed.

McCULLOCH, C. J., (dissenting). No question is raised in this case as to the constitutionality of the bill nor as to the policy which prompted the Legislature to pass it. There is before the court for decision only the

question whether the Governor vetoed the bill or approved it.

The case of *Powell* v. *Hays,* 83 Ark. 448, is controlling. The writer did not agree to the decision in that case, and the views set forth in his dissenting opinion have not undergone any change, but a decision on so important a subject should not be so lightly overturned nor whittled away to suit the exigencies of particular cases. It would be far better, though, to overrule it outright than to make refined distinctions which leave the law on the subject in a state of hopeless uncertainty. If the decision was the law for a case involving the veto of a bill to transfer a county from one judicial circuit to another, it still ought to be the law in a case where there is involved a veto of the race horse gaming bill, however objectionable such legislation may be to many citizens of the State.

Now, there were two opinions written in *Powell* v. *Hays, supra,* representing the views of the majority of the court, and it is necessary to consider the facts of the case to understand what was decided so far as relates to the present controversy. The bill was sent to the Secretary of State by Acting Governor Pindall, accompanied by a proclamation vetoing it. The signature of the Executive was not attached to the bill. Acting Governor Moore had signed it, but the signature had been erased. The record finally made by the Acting Governor, so far as related to the face of the bill, did not show that it had been approved. An erased signature was the same as no signature. Nor did the veto message of the Acting Governor show that the bill had been approved by his predecessor. He merely stated in his message that the bill had been signed by Acting Governor Moore and left in the executive office. That statement in the message, coupled with the assertion of the right to veto the bill, necessarily meant that it had never been approved, and as that was the final record made by the Executive the veto would have prevailed if this court had not decided to look beyond the record and ascertain the fact that

Acting Governor Moore had signed the bill as evidence of his intention to approve it. The necessary effect of the decision was, then, to supplement the record by oral proof of the intention of the Executive in affixing his signature, for the court held that the bill became a law the moment the Executive signed it with the intention of approving it, whether he lodged it with the Secretary of State or not. Oral testimony was in fact heard and considered by this court. In the opinion on rehearing, the majority disclaim the necessity for considering oral testimony, but the essential fact, *i. e.,* the intention of Acting Governor Moore, was not established in any other way, and it was said in the opinion that it was the sound view of the law of the case "to turn the question upon the intention of approval by the Governor rather than upon the less important act of the Governor or his subordinate in handing the bill over to another official."

It is not inappropriate to quote from an opinion in another case written by the Chief Justice who wrote both opinions in *Powell* v. *Hays,* to show that it was intended to hold that oral testimony was admissible. In *Ex parte Thompson,* 86 Ark. 69, Chief Justice HILL, speaking for the court, said: "In the case of *Powell* v. *Hays,* 83 Ark. 448, the court decided an act of a co-ordinate department of the government to be void upon the allegations in the petition and response. These allegations, however, were sustained by the oral testimony of distinguished witnesses in which there was no conflict as to essential facts, and also by record evidence from the office of the Secretary of State."

The undisputed evidence in the case, if oral testimony is to be considered at all, shows beyond any dispute that the bill was signed by the Executive with all the outward manifestations of approval so as to make it a law in the manner provided by the Constitution, according to the rule laid down in *Powell* v. *Hays, supra.* The testimony of the Governor himself shows that his action with respect to the bill was sufficient to amount to an approval, if the facts related by him are tested by the rule.

laid down in the case just mentioned. We need only consider the testimony of the Governor and his private secretary, there being no conflict between them on the points about which they testified. The Governor states that at all times during the consideration of the measure, after it had been delivered to him, he had no intention of approving it, but, on the contrary, intended to veto it, though his political and personal friends were earnestly importuning him to sign it. Monday, March 8, 1915, was the last day he had for considering it, and on the morning of that day he completed his veto message which he read to some of his friends. The bill as presented by the enrolling committee had the word "approved" written in red ink at the end of the bill on the last page, and, after leaving a space for the signature, contained also the words, "Governor of the State of Arkansas." At 4 o'clock in the afternoon of that day, while two of the Governor's friends were in the room urging him to sign the bill, he wrote the prefix "dis" before the word approved, and added the words, "March 8, 1915, at 4 o'clock P. M." He then placed a caret after the word "disapproved," and above the line wrote "and vetoed" and then signed his name above the words "Governor of the State of Arkansas." The two friends saw him write something on the bill, but it was not shown that they knew just what he had written, and they took it for granted from what was said and done at the time that he had approved the bill. One of them left the room at once and went out into the hallway and announced to the friends of the bill that it had been approved by the Governor. A few minutes later he was recalled to the room by the Governor and informed that the bill had not been approved, but, on the contrary, that it would be or had been disapproved. Other friends of the Governor who were interested in the bill's approval were called into the room and they begged the Governor to sign it, and he finally took his pen and ran a line through the prefix "dis" and the word "and," leaving the words above the signature "Approved, vetoed, March 8, 1915, at 4 o'clock P. M."

This was done pursuant to the urgent solicitation of the men in the room that the bill be approved, and when this was done everybody in the room gave forth expressions which show that it was understood by all that the bill had in fact been approved.

Every one present effusively congratulated the Governor on having approved and signed the bill.

The Governor called his private secretary, Mr. Stewart, and handed him the bill, with the directions to "report it," meaning to deliver it to the Secretary of State as an approved bill and to report the signing of the bill to the House in which it originated, in accordance with the provisions of the Constitution. Nothing was said at that time about the veto message, and it was not delivered to Stewart with the bill. Stewart took the bill and left the room with it, going into an outer office where the stenographer worked, and there he found what he described as a rather tumultuous body of men who were rejoicing in the approval of the bill and who reached for the bill, exclaiming, "Let me see it! Let me see it!" He started to unroll it, but before getting as far as the signature he stopped and rolled it up again and said to the crowd, "Gentlemen, you will have to get back until I can report this bill," and called the stenographer and began to dictate the report to the House of Representatives, when a messenger came from the Governor summoning him to return to the room, to which place he repaired, and the Governor took the bill from him and retained it. The Governor then left the executive offices and repaired to his residence, taking the bill and the veto message with him. The House of Representatives held a night session, and about 8 o'clock the bill was returned to the House by the Governor, with a veto message, and with the prefix "dis" being rewritten above the place where it had been previously written and erased, leaving the statement on the bill to read, "Disapproved, vetoed, March 8, 1915, at 4 o'clock P. M."

Now, the bill was, as before stated, signed with all the outward manifestations of approval. The effect of

what the Governor said and did was to declare to those present that he had approved the bill, and he did the last thing for him to do in turning it over to a messenger to deliver to the office of the Secretary of State. If the bill was in fact signed with all the indicia of approval, it was in fact an approval, and a mental reservation on the part of the Governor could not defeat the effect of this overt act. He says that his purpose was merely to get rid of his importunate friends who were urging him to do something against his own better judgment, but the fact remains, when stripped of those mental reservations, that the vital thing which under the Constitution amounts to an approval of the bill, for that instrument says in plain terms that if the Governor approves the bill he shall sign it. There is nothing for him to do with the bill, if he disapproved it, except to return it with his objections to the House in which it originated. Anything written on the bill by the Executive was entirely unauthorized in case of veto. When the bill left the hands of the Governor, it had on it the words, above the signature, "Approved, vetoed," but the addition of the last word would not have prevented the bill from going into effect as a statute if it had been delivered to the Secretary of State. It is none the less effectual as a law because it did not reach the office of the Secretary of State, inasmuch as the court in *Powell* v. *Hays* said that the question turns, not upon the physical control of the paper, but upon the intention of the Governor when he signs his name to it.

It is difficult to say just what the effect would have been under the rule in *Powell* v. *Hays* if the Governor had retained the bill in his own hands, but here we have the added fact that he actually parted with it and completely surrendered control of it. He gave no sign to his secretary that the bill was to be retained, but, on the contrary, he spoke the words which amounted to a positive direction to the secretary to deliver it to the Secretary of State where it was to be deposited among the approved bills. The Governor in his testimony gives an interpretation of his own words as follows: "If I hadn't given him any

further direction, he would have written a report of the bill, possibly, and reported it to the House, and then filed it with the Secretary of State. Q. As signed and approved? A. Just as I have stated. But it wasn't given to him with the intention of getting that far with it.''

The thing that gave vitality to the bill as a law was the signature of the Governor, and anything that he wrote above his signature was surplusage. The Supreme Court of the United States, in construing a Federal constitutional provision, said of the act of the Chief Executive: ''Even in the event of his approving the bill, it is not required that he shall write on the bill the word 'approved,' nor that he shall date it.'' *Gardner v. Barney,* 6 Wall. 499. That being true, the addition of the word ''vetoed'' would not have defeated the constitutional effect of the Governor's signature if the bill had reached the Secretary of State, nor even prevent it from taking effect before that time if the signature was attached under circumstances which manifested an intention to approve it. The delivery of the bill to the private secretary, for the purpose of having him carry it to the Secretary of State's office, was as complete a surrender of it as if it had been in fact delivered to the Secretary of State. In *Powell* v. *Hays,* this court held that the bill became effective while it was lying on the desk in the executive office bearing the signature of the Acting Governor. If that be true, certainly when this bill was turned over to another individual, with positive instructions to deposit it with the officer whose duty it was to preserve it among the statutes of the State, it became a law if we are to adhere to the rule announced in the case above cited.

The writer is authorized to say that Mr. Justice HART concurs in the conclusions here stated.